J-A15027-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.K-L.V. A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER AND J.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 243 WDA 2023 |

Appeal from the Order Entered February 1, 2023
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
O.A. NO. 22-00025

| | | |
|---|---|---|
| IN THE INTEREST OF: C.K-L.V. A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER AND J.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 309 WDA 2023 |

Appeal from the Order Entered February 14, 2023
In the Court of Common Pleas of Butler County Juvenile Division at
No(s):  CP-10-DP-0000021-2021

BEFORE:   MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.

MEMORANDUM BY McLAUGHLIN, J.:               **FILED:  September 7, 2023**

M.B. ("Mother") and J.B. ("Father") (collectively, "Parents") appeal from the orders terminating their parental rights to C.K-L.V. ("Child") and changing Child's goal to adoption. They argue the trial court abused its discretion in finding termination was proper under 23 Pa.C.S.A. § 2511(a)(1) and in finding both parents had to remedy the issues that led to removal where Parents remained an intact couple. They also contend that it erred in relying on the

bonding assessment because Child was ill at the time of the assessment. We affirm.

Mother became involved with CYS prior to Child's birth, when her other son was injured in a scalding bath while in Father's care.[1] Child was born in February 2021, and in April 2021, Butler County Children and Youth Services ("CYS") filed a dependency petition for Child, but withdrew it. Approximately three months later, in July 2021, the trial court granted CYS emergency custody of Child.[2] CYS filed a dependency petition, and the court adjudicated Child dependent in August 2021. In July 2022, CYS filed petitions for the involuntary termination of parental rights of Mother and Father, seeking termination under 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). In October 2022, CYS filed a petition for a goal change to adoption.

At a January 2023 hearing, CYS presented the testimony of Dr. Eric Bernstein, who completed evaluations to assist the court in making its determinations. He first discussed his findings as to the foster parents. He found the foster parents provided for Child and oversaw his safety, and "presented as calm, easygoing[,] . . . attentive and casual." N.T., Jan. 13, 2023, at 14. He pointed out that Child "solicited attention from" the foster parents, "shifting from one lap to another," and that both gave him attention and answered his questions. *Id.* Dr. Bernstein found that Child relies on the

---

[1] Father is not the father of Mother's other son.

[2] Following a shelter care hearing, the court transferred legal and physical custody to CYS.

foster parents for his everyday needs, and the foster parents provide daily routine, structure, support, and care. *Id.* at 27-28.

Dr. Bernstein then discussed his observations of Parents. He pointed out they "were an intact couple and living together," and shared the home with ten cats, one dog, and two chinchillas. *Id.* at 17, 21. Parents had recently removed seven cats to comply with a city ordinance. *Id.* Father was not employed and had undergone some mental health and alcohol treatment. *Id.* at 17-18. Mother was employed at a hospital. *Id.* at 21. Father had physical altercations with prior girlfriends, overdosed on Risperdal five years ago and attempted suicide, and has had five psychiatric hospitalizations. *Id.* at 18. Parents informed Dr. Bernstein that they intended that Father would be Child's fulltime stay-at-home parent. *Id.* at 19. Dr. Bernstein further discussed with Father the prior scalding incident of Mother's older child, and Father acknowledged that he "'may have been' under the influence of substances at the time he administered the bath to" the child. *Id.* at 19-20. Father told Dr. Bernstein that he was the "problem child" in the case. *Id.* at 51.

Dr. Bernstein testified that Father brought a new box of crayons for Child, and Child struggled with the function of the crayon and how to use it. *Id.* at 25. He testified that Father presented as "reserved and flat in expression, not particularly communicative, which . . . did not advance or stimulate [C]hild's interaction." *Id.* He found Father "offered minimal communication." *Id.*

Dr. Bernstein testified that Mother "was much more attentive and responsive," and she was taking care of Child's runny nose, which Father did not do. *Id.* at 26. Mother showed "more responsivity and engagement." *Id.* at 27. Dr. Bernstein testified that Mother was a "capable parent," but is committed to full-time employment and reliant on Father to serve as a full-time caregiver. *Id.* at 29. He found that Mother "seems to choose [Father's] needs . . . over [Child's] needs," and he therefore had "concerns . . . about her prioritization." *Id.* He testified that Mother and Child had a limited bond and when compared to the bond Child shared with Father, the bond between Child and Mother was stronger, "measured not only by her capacity, but also by her interaction with [C]hild, and as affirmed by [Foster Parents] who seemed to acknowledge that [M]other has an important relationship with [C]hild." *Id.* at 37.

Dr. Bernstein recommended terminating Parent's rights and for Child's permanency goal to be changed to adoption. *Id.* at 30.

Dr. Bernstein pointed out that Mother and Father were concerned about Child's health on the day of the assessment. *Id.* at 23. He noted that after speaking with the CYS representative, Parents proceeded with the evaluation with the understanding Child's cold symptoms were mild. *Id.* at 24. He stated he would have rescheduled if asked. *Id.* In his report Dr. Bernstein stated that "[Father] preferred to reschedule the appointment but ultimately conceded after [the CYS caseworker] explained that children commonly experience colds and nothing about [Child's] presentation raised significant concern nor

compromised his ability to meaningfully participate in the interaction." *Id.* at 33. Mother expressed similar concerns, but also agreed to continue. *Id.* at 34. Dr. Bernstein's report also stated that Child's "energy level gradually dissipated and by the completion of the interaction [he] presented as much more lethargic and fatigued." *Id.* at 35. Dr. Berstein testified that people are not always at their best during the evaluations, noting

> [s]ome children are having a temper tantrum, some children are just awakened from sleep and are groggy, some children are sleeping through the interaction. You never know what to expect. And I don't have any expectations other than that the parents [are] invested, engaged, supportive and adequately supervising the child to the best of their ability.

*Id.* at 48. He stated that it is not how a child acts that determines his impressions, "but rather how the parents respond to the child," noting it is "how much the parents appreciate, anticipate in response to the child" that is important. *Id.* at 49. He further noted Child was engaged in activity, responsive, and ate in an interaction with Mother. *Id.* at 50.

CYS entered into evidence a recommendation for adjudication for Child's half-brother, D. The documents stated that Mother had been at work when D. suffered burns while in the care of Father and noted that Father stated that D. was burned in the tub when the water was turned on. *Id.* at 58-59. According to the document, D. was not taken to the hospital until the following day, and D. spent two days in the hospital "due to the burns which were located on his penis, his scrotum, the back of his right leg, his back, and his stomach." *Id.* A child abuse investigation was completed but indicated as

unfounded. *Id.* The report also stated that CYS had concerns regarding "[Father's] discipline of [D.] and [Mother] admitted that [Father] is aggressive with [D.]" *Id.* at 59-60. CYS further admitted into evidence the recommendation for termination of court supervision in D.'s case, where CYS advised D.'s father that if Mother had visits with D. in her home, Father could not be present. *Id.* at 60.

The senior program director at the Lighthouse Foundation, Jayme Steighner, testified that Mother had been a resident at the transitional housing program, which is an 18-month program offered to individuals deemed homeless. *Id.* at 61. Mother moved into the housing in April 2021 and had Child with her at that time. *Id.* at 62. Steighner testified that Mother did not successfully complete the program and was terminated in January 2022. *Id.* at 63. She stated that Mother had ten cats, a chinchilla, and a rabbit in the apartment even though the program has a strict no animal policy and, after being given multiple chances, Lighthouse asked Mother to leave when it found more animals. *Id.* Further, in July 2021, Father visited, was allegedly drinking, and "punched a hole in the bathroom door trying to get to [Mother] and had done some other destructive things to the apartment." *Id.* at 64. Steighner testified that Lighthouse told Parents that Father no longer was permitted on Lighthouse property. *Id.* He was never found on the property again, but "there were multiple occasions when it was believed that he [had] violat[ed]" the prohibition. *Id.* at 64-65.

Totin Family Services case manager Elizabeth Monaco testified. Monaco began working with Mother in September 2019, before Child was born. *Id.* at 69. In 2019, Monaco worked with Mother on "safe, stable housing, employment," budgeting, working to set up WIC, and starting therapy. *Id.* at 70. They worked on the same areas after Child was born, as well as grocery shopping, scheduling, and pill counts. *Id.*

Monaco testified that Mother has cats and chinchillas and that her animals caused problems when searching for housing. *Id.* at 71-72. She further testified that Mother received a $6,600 tax refund and spent it in a week, purchasing "many luxuries," including ordering wine online and video games for Father. *Id.* at 74. Mother also spent a small portion of the return on a back utility, and she paid ahead on rent and the cell phone bill. *Id.* at 75. Monaco testified that Mother had been doing better with a "positive in the bank account" for the last two months, but for "roughly at least a year, there was a constant negative balance and purchases were being made for luxury." *Id.* at 81. Monaco testified that when she was last in the home there "were dirty dishes all over the sink," and "a strong odor of urine." *Id.* at 78.

Empowerment Specialist with the Children's Institute, Kaitlyn Leasure, testified that she had been working with Parents with supervised visits and parenting. *Id.* at 83. Leasure testified that they had been doing in-home visits, but the visits returned to the agency because the home had cockroaches and Child almost grabbed a cockroach trap. *Id.* at 84. Leasure stated that she had been working on budgeting with Mother, but recently Mother had not been

forthcoming and wanted to do the budget on her own. *Id.* Leasure testified that Parents "frequently argue about conversations that need to be happening at home and not in front of [Child]," stating they argued while Child was just left to play in the room. *Id.* at 85-86. She agreed that there were concerns that Mother focused more on Father during the visits, and agreed Mother was more attentive to Child when visiting without Father. *Id.* at 86. Leasure testified that Parents brought snacks, diapers, wipes and something to drink to the visits. *Id.* She stated Mother engages Child, but Father does not, and she must often ask Father to stay awake during the visits. *Id.* at 87. She stated Father fell asleep while holding Child during a visit and left because he was going to fall asleep again. *Id.* Leasure testified that Parents completed the parenting curriculum, but still use the parenting book, noting they referenced it recently to remind Father how to change a diaper. *Id.* at 88-89, 92. She stated that Father got frustrated because he could not determine which side of the diaper was the back and threw the diaper across the room. *Id.* at 89.

Leasure stated the condition of Parents' home fluctuates. She stated recently there was a strong urine smell and dishes covered the whole counter, and Parents still had cats, a dog, and chinchillas. *Id.* at 90.

The JusticeWorks Youth Care program director, Steven Snow, testified that he has provided and monitored services to Parents since April 2021. *Id.* at 97-98. JusticeWorks helps with housing, budgeting, drug testing, and pill counts. *Id.* at 98. Snow predominately worked with Father. *Id.* They worked

with employment, housing, budgeting, and various identified goals. *Id.* at 98-99. He testified that Father averaged one drug screen a week, which consistently was positive for THC. *Id.* at 99. He stated that within the past couple of months, Father obtained a medical marijuana card, but he had been testing positive for the narcotic prior to obtaining the card. *Id.* Snow stated that Father had wanted to get a job, but then "pivoted to getting Social Security, which he was denied." *Id.* at 100. Snow further testified that Father has some mental health medication, but had not been taking the medications as prescribed, as there were more pills in the bottle than expected during pill counts. *Id.* at 101. He stated Father had "been more compliant with mental health and drug and alcohol services more recently, but not over the course of [JusticeWorks'] involvement." *Id.* at 102. Snow testified that Father relapsed but entered treatment following the relapse. *Id.* at 107.

An outpatient therapist at Family Pathways, Christopher Good, testified that he had been assigned to Parents' case for couples counseling. *Id.* at 109-10. Parents were unable to schedule a counseling time and therefore have not had any sessions. *Id.* at 111. Good would be available if Parents chose to avail themselves of the counseling. *Id.*

A foster care caseworker with Adoption Connection, Catherine Kellner, testified that she visits the foster home at least every 30 days. While there, she observes a "lot of playing, a lot of smiles, a lot of happiness." *Id.* at 115. She testified that Child looks up to his older resource siblings and looks to

Foster Parents for approval and comfort. *Id.* She testified that Child transitioned well into the foster home. *Id.* at 116.

CYS caseworker Erin Lawson testified that she has been working with Mother since October 2019. *Id.* at 119. She testified that when Mother was pregnant with Child, she resided with a friend in a home that was not appropriate for a newborn. *Id.* at 120. CYS provided guidance and Mother made the home appropriate. *Id.* at 120-21. Mother eventually moved into the Lighthouse program. *Id.* at 121. While Mother was at Lighthouse, Child was removed after a domestic violence incident during a visit with Father. *Id.* at 123. After Mother was removed from the Lighthouse program, Parents acquired an apartment together. *Id.* at 122-23. Mother's goals included continuing her parenting classes through Project Stars, which had hands-on education where they worked on bathing, changes, appropriate sleep, and similar things. *Id.* at 124. Mother also was to work on making decisions that positively impacted Child. *Id.* Lawson further testified that Mother was concerned with the progress Father made, and tried to help him look more engaged, and such focus on Father was detrimental to Mother's progress. *Id.* at 125. Lawson stated Mother is a "very hard worker" and employed as a nursing assistant at Butler Hospital. *Id.* at 126. She testified that with Mother's salary, there should have been a surplus at the end of the month for meeting necessities, but Parents constantly needed resources like the food cupboard. *Id.* She testified they had ongoing discussions regarding wants versus needs. *Id.*

Lawson testified that she understood that Mother still participated in mental health treatment and had several prescription medications. *Id.* at 127. One of the things Mother was working on was choosing healthy relationships with individuals who are drug-free and safe to be around her child. *Id.* Lawson noted that CYS had concerns regarding Father's ability to safely parent Child, pointing out there had been some domestic violence concerns. *Id.* Lawson testified Mother had stabile housing and recently had ensured the utilities were paid. *Id.* at 128.

Lawson testified that after Child was adjudicated dependent, Father completed a drug and alcohol evaluation and entered rehab. *Id.* at 129. Father followed through with intensive outpatient treatment in the short term, but then experienced an alcohol relapse. *Id.* at 130. Lawson further agreed that Father has tested positive for THC throughout the case. *Id.* She stated Father obtained a medical marijuana card at some point, but it did not alleviate the concerns, noting that although CYS does not have a strong stance on marijuana, they observed Father at visits both when he had used marijuana and when he had not, and found "the quality of his visits were much improved" when he was not using marijuana. *Id.* at 131. She stated that after he obtained the medical marijuana card, the agency saw the "visits backslide again," including that at one visit Father was falling asleep with Child on his lap. *Id.* Lawson testified Father completed a mental health evaluation, but she did not believe he followed through with all recommendations. *Id.* at 132. She further did not receive any documentation that Father had engaged in anger

- 11 -

management, and, although the agency did not ask for anger management, Father's anger had been a concern throughout the case. *Id.* at 132, 150-51.

Lawson further testified that there had consistently been numerous animals in the home. *Id.* at 133. Lawson testified that during visits Parents sometimes argue about household tasks or court, noting that "the disagreements . . . escalate to a level that [Child] is kind of in the middle of the visitation room, looking at [Mother] and [Father] while they're arguing above his head." *Id.* at 136. She stated she has had conversations with Mother about how she needs to prioritize Child, but Mother continues to prioritize Father. *Id.* at 137. She further stated that CYS's position is that if Parents "are an intact couple, both of them need to complete the tasks on their Child Permanency Plan." *Id.*

Lawson agreed that after the November 2022 permanency review hearing, there was a recommendation that Mother's visits occur outside CYS and, if they went well, they would go to overnight visits. *Id.* at 138. She stated that the visits did not move because there was still a bug infestation in Parents' home and CYS did not receive documentation until January 6, 2023, that the pests had been treated. *Id.* She stated that Mother's interactions with Child are appropriate, and Mother is engaged when interacting with Child. *Id.* at 139.

Lawson testified that CYS's concerns regarding Mother's parenting skills are that she is "not parenting in isolation." *Id.* at 143. Rather, "she's co-parenting with [Father and] that continues to be a huge concern . . . because

- 12 -

[Mother's] asserted that . . . the bulk of the child[-]care responsibilities [will] fall on [Father]." *Id.* at 143-44. Lawson stated CYS has talked to Mother about finding a daycare provider, but Mother has not shown much interest, and noted that Mother has "been very adamant that [Father] is going to be providing the child care." *Id.* at 144.

Lawson testified that on the day of the bonding assessment, she transported Child to the visit and did a visit with the foster family. *Id.* at 147. She spent an hour in the foster family's home and observed Child eat lunch and that he was not feverish. *Id.* She testified that the foster family informed her that Child was getting some molars and was not himself. *Id.* She stated that Mother raised concerns regarding Child's health at the visit, and Lawson shared with Mother the importance of the appointment and that it had more to do with Mother's interactions with Child than Child's interactions with Mother. *Id.* at 147-48. Lawson testified she left the decision of whether to continue or reschedule to Parents. *Id.* at 148. She stated that she told Mother that she cannot "tell [Mother] what to do, but it's [her] opinion that . . . [Child is] not so sick that it's impacting his ability to interact." *Id.*

Father testified next. He stated he is employed through Unlimited Staffing, where he has been taking down lights for about a week, and that that job should continue through February. *Id.* at 158. He stated there was "talk" of more permanent employment after the current project. *Id.* at 158-59. He testified he has been diagnosed with bipolar and adjustment disorder, is being treated with medicine for the bipolar disorder, and is in therapy. *Id.*

at 162-63, 165. He testified his mental health is manageable. *Id.* at 164. Father testified he is an alcoholic. *Id.* at 166. His last relapse was in August 2022, and he has not had a drink since then. *Id.* He testified he entered treatment after his relapse, and successfully completed the intensive outpatient treatment, but did not successfully complete the remaining outpatient treatment. *Id.* at 166-67.[3] He is not currently attending alcoholic anonymous meetings. *Id.* at 168.

Father testified he did not feel prepared to have Child returned to his custody at the time of the hearing. *Id.* at 169. He stated there was "a lot to do at the house," and they "need[ed] to clean up a lot." *Id.* Father agreed that if Child was returned to his care, he would be the primary caregiver. *Id.* at 170. He testified that he can "definitely take on the responsibility of a child," and "[i]t's just learning how to implement my coping skills better." *Id.* at 171. He stated that prior to his recent employment, his average day consisted of waking up no later than 10:00 a.m. and playing video games all day. *Id.* Father does not know what Child's schedule is. *Id.* at 173. He testified that Parents are current on the rent and all utilities except internet. *Id.* He testified the cockroach problem has not been resolved but it was "in the works," and they have an exterminator who comes quarterly. *Id.* at 174. He stated that,

---

[3] Father was to attend three meetings a week with intensive outpatient treatment and two meeting a week with outpatient treatment. N.T. at 166-67.

- 14 -

at the time of the hearing, six animals lived in the home—three cats, one dog, and two chinchillas. *Id.*

Father testified that on the day of the bonding assessment, Child was "a bit sick," and he asked if they should reschedule the appointment. *Id.* at 178. He stated that Lawson told him that because of "something to do with time," they should do it that day. *Id.* When asked whether he felt "shortchanged on any ability to demonstrate [his] parenting," he responded that he did not. *Id.* at 186.

Father stated that if Child came to live with him, he would "[a]bsolutely" consider a daycare option. *Id.* at 181. Father testified that he previously pled guilty to simple assault, where the victim was an ex-girlfriend. *Id.* at 182-83. Further, he testified he was the caretaker of Mother's first child when the child was burned, and that at that time he was drinking every day. *Id.* at 183-84. He testified that he was offered Dr. Bernstein's report but did not read it. *Id.* at 185.

Mother testified that she is employed full time at Butler Memorial Hospital as a nursing assistant and works 40 hours per week. *Id.* at 189-90. She works 6:00 a.m. to 2:30 p.m. on an eight-hour shift and 6:00 a.m. to 6:30 p.m. on a 12-hour shift. *Id.* She testified that she is current on the bills and has paid ahead for the rent. *Id.* at 190. Mother testified she is trying to get a nursing degree. *Id.* at 195.

As to the bonding assessment, Mother stated that Child was sick, and not acting "like his normal self." *Id.* at 191. When asked if his illness prevented

her from being able to demonstrate her parenting abilities, she said "no, but it prevented me from having a . . . good day of expressing." *Id.* She testified that she spoke with Lawson about rescheduling, and Lawson said they were in a "time crunch." *Id.* at 203.

Mother testified she was prepared for Child to come home. She stated that she has money set aside and uses a budgeting system. *Id.* at 196. When asked if the house was in a condition that would allow a child to reside there, she stated that "[t]here is a lot of laundry that needs [to be] put away." *Id.* Mother did not think there was a pet issue, and when asked whether there was a cleanliness issue, Mother stated, "a little bit." *Id.* She testified they have exterminators who come quarterly, and another person came to complete a treatment for flea and roach control, but agreed there still was a problem. *Id.* at 196-97.

When asked whether Father would be the primary caregiver, Mother testified they were thinking about daycare, and she had talked to Father's family about taking care of Child when Mother works weekends. *Id.* at 198. However, when asked whether she trusted Father to watch Child, she responded that she did not "really see much of an issue with it." *Id.* Mother testified that the last time Father drank alcohol was on the night they got engaged, and both she and Father drank alcohol, as "a celebration type of thing." *Id.* at 200.

In February 2023, the trial court terminated the parental rights of Mother and Father, finding CYS presented clear and convincing evidence of

grounds for termination under Section 2511(a)(1), (a)(2), (a)(5), and (a)(8), and that termination best met Child's needs and welfare under Section 2511(b). The trial court changed Child's permanency goal to adoption.

Mother and Father raise the following issues:

I. Did the Trial Court commit an abuse of discretion and an error of law finding that both parents were required to remedy the issues that led to removal of the child as the parents remained an intact family unit?

II. Did the Trial Court commit an abuse of discretion in granting a goal change and granting the Involuntary Termination of Parental Rights Petition by finding that there was clear and convincing evidence the natural parents could not or would not remedy the conditions that led to removal of the child within a reasonable period of time, and that the services available were not likely to remedy the conditions which led to placement when the agency testified that Mother had substantial compliance with the Child Permanency Plan and Father had moderate compliance; that both parties were actively engaged in services with the agency; that both parties engaged in regular visits with the child and were bonded to the child; that Mother was employed with sufficient income to support the household and the child; and both parties were actively engaged in receiving mental health treatment, including treatment needed to maintain sobriety, that the parents had actively engaged services needed to remedy the insect infestation in their home at their own expense; that they had removed pets from the home; were willing to use outside childcare and that Father was active in his recovery and looking for employment?

III. Did the Trial Court commit an abuse of discretion in giving weight to the testimony regarding the bonding assessment as the child was ill at the time; that both [M]other and Father requested that the assessment be rescheduled; and that the caseworker persuaded the parents to continue with the assessment due to time constraints?

Parents' Br. at 5.[4]

When we review an order terminating parental rights, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We may reverse a trial court decision for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

We will address Parents' second issue first. It challenges termination under subsection 2511(a)(1).

Parents argue their conduct in the six months immediately preceding the filing of the petition did not evidence a settled purpose of relinquishing parental claim or refusal or failure to perform parental duties. They claim that in response to concerns about Father being the primary caregiver due to Mother's work hours, they expressed a willingness to have a third party care for Child, rather than Father. They note many families of limited means work long hours and cobble together childcare. Characterizing the termination as

---

[4] Father and Mother do not challenge on appeal the goal change to adoption or the trial court's finding that termination was in Child's best interest under Section 2511(b). Although they mention "goal change" when stating their issues, they include no argument in the brief to support the claim the court erred in changing the goal to adoption.

being because Mother "works long hours," they argue that it "defies logic" to terminate for that reason when employment was part of her permanency plan. Parents' Br. at 18. Regarding Father's sobriety, Parents claim Father had only one relapse and note he self-reported and attended a rehabilitation program.

As for the living situation, Parents claim they obtained stable housing, which consumed a large portion of their resources, they rehomed animals to align with local ordinances, and treated the apartment for pests, at significant expense. They argue that it takes time to save for the exterminator and that they had the home treated twice evidenced they were willing to maintain it should Child return. They argue that terminating for failure to satisfactorily "remedy their living situation" is "penalizing [Parents] for nothing other than poverty." *Id.* at 19.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *See In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Section 2511 requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory

grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only agree with the trial court's decision as to any one subsection of Section 2511(a). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Subsection 2511(a)(1) provides:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

To terminate under subsection 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa.Super. 2008).

- 20 -

Further, with respect to subsection 2511(a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). "Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004). Further:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*Id.* (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (internal quotation marks omitted)). Parental duty requires that a parent "act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* A parent must "utilize all available resources to preserve the parental relationship, and must exercise

- 21 -

reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.*

The trial court concluded CYS established by clear and convincing evidence that the conduct of Mother and Father, for at least six months prior to the filing of the petition, evidenced a settled purpose to relinquish parental claim or a refusal or failure to perform parental duties:

> Instantly, Child had been adjudicated dependent on August 19, 2021. The Petition to involuntarily terminate Mother's parental rights was filed July 19, 2022, nearly a year later. In the Petition, CYS reported that Mother had not "completed the goals and tasks set forth for her by the agency". Nor had she addressed her mental health needs. Similarly, in Appendix No. I of the Petition for Involuntary Termination of Parental Rights as to Father, CYS reported that Father had not "demonstrated the ability to provide for [Child's] basic needs;" and had not sufficiently addressed his alcoholism. . . . [T]he hearing regarding the involuntary termination of parental rights was held approximately eighteen (18) months after Child had been adjudicated dependent.

> CYS, and several providers which they engaged, have been involved with Mother and Father since 2019, when Mother's firstborn child was removed from the home, following the above-referenced incident while that child was in Father's care. The services provided through CYS for Mother and Father, included parenting instruction, budgeting help, individual therapy, couples' counseling, and addiction treatment for Father.

> Although, at the January 13, 2023 hearing, Mother testified that all of the household bills were paid, except for the internet bill, this has not historically been the case. For instance, when Mother received her tax refund check of $6,000, she spent it in a week, and even purchased a bottle of wine, despite knowing that Father struggles with alcoholism. Additionally, although Mother's bank account had a positive balance during the two months preceding the

- 22 -

hearing, the account had a consistently negative balance during the preceding year due, in part, to luxury purchases.

The condition of the parties' home has also been an ongoing concern throughout the course of this case. At the hearing, the CYS case manager testified, credibly, that upon her visit to the home on December 20, 2022, "there were dirty dishes all over the sink [and] there was a strong odor of urine." In addition, caseworkers discovered that there has been a constant influx of animals into the home, despite some animals having been removed from the home. Father testified that there were six (6) animals in the home on the date of the hearing. Additionally, although the home had been treated for pests in December, 2022, Father testified that there were still cockroaches in the home as of the date of the hearing. The home is also very cluttered, and Father testified that he was not ready for Child to be returned to his custody on the date of the hearing because "there's a lot to do" at the house to clean up the clutter.

Additionally, Father has done little to address maintaining his sobriety. Father admitted that he did not successfully complete outpatient alcohol treatment, and that "beyond not drinking" he does nothing to maintain his sobriety. Father admitted using marijuana every day for the preceding eight months, though he had not obtained a medical marijuana card until a few months before the hearing. Although she testified that they no longer keep alcohol in the home, Mother also testified that she and Father drank alcohol in August, 2022.

Further, it has consistently been [P]arents' intention that Father serve as Child's primary caretaker. However, Father testified that he did not even know Child's schedule. Furthermore, Father testified that he usually sleeps until 10:00 a.m., then plays video games all day. Indeed, according to one of the caseworkers, Father was not able to stay awake for four-hour visitations with Child, and at one point, got so frustrated when trying to change Child's diaper, that he threw it across the room. A caseworker also testified that "[w]e have concerns for [Father's] ability to safely parent [Child]," and that those concerns "have been consistent through the life of the case." Further, Father admitted to not reading the evaluator's report from the bonding assessment, although he had been directed to do

so, and that he did not complete everything on the permanency plan. Father also admitted to having anger management issues. Father testified that he feels "like [he] can definitely take on the responsibility of a child. It's just learning how to implement my coping skills better . . . ." According to Dr. Bernstein, during his bonding assessment, Father referred to himself as "the problem child in this case[.]" This Court found, by clear and convincing evidence, that [P]arents historically, and consistently, have been noncompliant with the CYS reunification plan, the terms of which were focused toward establishing a safe home and adequate care for Child.

Trial Court Opinion, filed Mar. 28, 2023, at 4-7 ("1925(a) Op.") (internal citations omitted; footnote omitted; some alterations in original; "Natural" omitted before "Mother" and "Father").

The trial court further concluded that CYS established grounds for termination under Section 2511(a)(1):

One of the things requested by CYS to be remedied, was the condition of the parties' home. At the inception of the case, [P]arents had ten (10) cats, one (1) dog, and two (2) chinchillas. Father did remove several of the cats from the home, but the home remained overridden with cockroaches and fleas, making in-home visitation with [C]hild impossible. At one in-home visit, a caseworker observed the child nearly pick up a cockroach trap. Further, caseworkers only received documentation that the home had been treated for pests on January 6, 2023 — one week prior to the hearing. It became apparent to the Court that, despite the passage of well more than a year from the time that Child was detained, and the urging of CYS representatives to prioritize the items requested in order that Child could return to the home, [P]arents did little to demonstrate a sincere effort or intent to make a safe, clean, pest-free home a priority for Child. Instead, [P]arents have chosen to allow their pets to remain in and soil their cluttered and dirty home.

. . .

- 24 -

> During the hearing, the evidence showed that Mother worked long hours, leaving [C]hild in Father's care, Although Mother stated that she was looking to take nursing classes at Butler County Community College, she did not supply any evidence to support this claim. Significantly, Mother's firstborn child had been removed from the home after the child suffered burns while in Father's care. Father evidenced a long history of unemployment and inability to maintain employment. Therefore, it is clear to the Court that [C]hild would be, as the parties voiced was their intention, in Father's care while Mother is at work. This is especially concerning because, although visitations of four-hour periods had been arranged between Father and Child, Father was not able to remain awake for a four-hour period. Therefore, this court found, by clear and convincing evidence, that Child would be without essential parental care during the time he was in Father's care.

*Id.* at 7-9 (internal citations omitted; "Natural" before Mother and Father omitted).

The trial court did not abuse its discretion in finding CYS established grounds for termination under subsection 2511(a)(1) by clear and convincing evidence. Mother and Father's home was not a safe environment for Child and they planned to have Father as the primary caregiver for Child, even though he was not able to safely care for Child. The evidence was sufficient to establish a failure to perform parental duties during the six months preceding the termination petition.

In their first issue, Mother and Father argue that the court erred and abused its discretion in finding that both parents were required to remedy the

issues that led to removal where the parents remained an intact couple.[5] They argue parents have a fundamental liberty interest in raising their children and the government cannot intrude unless it advances a compelling state interest. Mother and Father argue they are an intact couple. They claim that the caseworker testified Mother had done everything required by the case management plan. They argue that although CYS had concerns regarding Mother's budgeting, she had paid her rent three months in advance and paid in advance for other utilities and still had money in the bank. Mother also had paid two exterminators to address the bug infestation. Parents argue that CYS refused to reunify Mother with Child because Father was not compliant, pointing out that there was testimony that, where the parties were an intact couple, CYS required both parties to be compliant prior to reunification. Parents claim there is no case or statutory support for this position and allege the only thing Mother did not do was end her relationship with Father.

Parents maintain that Father's goals included safe and stable housing, which Mother provided; employment, which Father alleged he was seeking; and mental health/substance abuse treatment, which Father allegedly obtained. They note that CYS cited concerns with Father as a caretaker but argue that there was no founded report of abuse against him. Parents further state that Father only tested positive for THC during the case. They further

---

[5] To the extent this issue attempts to challenge the court's finding under Section 2511(a)(5), we do not address it, as we already found termination proper under Section 2511(a)(1).

claim they were willing to use a third-party caregiver if needed. They claim requiring both parents to be compliant, and not returning Child to the compliant parent, is inconsistent with case law and the controlling statutes. They claim the only thing Mother did not do was end her relationship with Father and, although CYS did not require this, "it is clear from the evidence at trial" that her rights were terminated because of the relationship. Parents' Br. at 15. They maintain that Mother was a "ready, willing, and able parent." *Id.*

The trial court concluded:

> The conditions by CYS to be met by [P]arents, prior to Child being returned to their care, were reasonable and were designed to ensure that Child would return from foster care to a safe home and be adequately cared for. However, both parents insisted that Father would be the caretaker for [C]hild when Mother worked. Notably, although Mother has made some progress toward addressing the concerns identified and sought to be addressed by CYS, substantial, credible testimony, including that of Dr. Bernstein, evidenced Mother's placement of her relationship with Father at a higher priority than reunification with and welfare of Child. Given Father's inability to maintain sobriety, produce any evidence of sincere efforts to do so, or to be able to stay awake for four-hour periods, coupled with the parties' failure to address the pest-infested, cluttered and filthy conditions of the home and no credible basis to believe that these conditions would change, this Court found clear and convincing evidence that grounds for involuntary termination of both Mother and Father's parental rights had been established and that terminating [P]arents' parental rights best serves Child's developmental, physical, and emotional needs and welfare.

1925(a) Op. at 10 ("Natural" before "Mother" and "Father" omitted; internal citations omitted).

Contrary to Mother's and Father's contention, the trial court did not terminate parental rights merely because the parties remained an intact couple. Rather, as discussed above, the court found CYS established by clear and convincing evidence that grounds for termination existed. The court found the conditions of the home, the child-care plan, and Father's in ability to safely care for Child, among other things, established termination was proper. The record supports the court's factual findings and its conclusion was not an abuse of discretion.

In their final claim, Mother and Father assert that the trial court abused its discretion in giving weight to the bonding assessment because Child was ill during the assessment. They maintain that at the start of the bonding assessment, they expressed concern that Child was sick and suggested rescheduling. They claim that Dr. Bernstein's testimony that Child was not listless does not mean Child was well enough for a visit. They point out he also testified Child was getting progressively more lethargic. Further, although Dr. Bernstein said he was willing to reschedule the appointment, the caseworker suggested they move forward due to time constraints. They argue it is "beyond naïve to not recognize that caseworkers wield an enormous amount of power and influence over parents." Parents' Br. at 22. Parents further claim that Dr. Bernstein refused to say whether a child's condition could have impacted the evaluation. They conclude the record does not support the reasons or factual basis for putting weight on Dr. Bernstein's testimony regarding the bonding assessment.

The trial court concluded:

> Dr. Bernstein testified that in his career, he has performed approximately 9,000 bonding/parenting capacity evaluations. He also testified, credibly, that he did not find the [C]hild to be listless, or express reservations about the accuracy or reliability of his findings being compromised, given [C]hild's presentation at the assessment. Dr. Bernstein further opined that the stability which [C]hild has in the foster home would outweigh any loss he might experience as a result of the termination of [P]arents' parental rights.

1925(a) Op. at 9 (internal citations omitted).

The court did not abuse its discretion in relying on the bonding assessment. Although Child was sick, he was not so sick that he was unable to interact with Mother and Father. Both Mother and Father agreed that they had been able to demonstrate their abilities. Further, Dr. Bernstein testified that children are often not at their best at assessments, but he does not have any expectations "other than that the parent[] . . . is invested, engaged, supportive and adequately supervising the child to the best of their ability." N.T at 48. The assessment focused on Mother's and Father's actions, not Child's.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  9/7/2023